IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PONDER RESEARCH GROUP,      §
LLP, ET AL.                 §
                            §
VS.                         §      CIVIL ACTION NO.4:09-CV-322-Y
                            §
AQUATIC NAVIGATION,         §
INC., ET AL.                §

<u>ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS</u>

Pending before the Court is the Motion to Dismiss (doc. #10) filed by defendant Brian Coffin.  In the motion, Coffin seeks dismissal of the claims against him based on lack of personal jurisdiction, failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and failure to plead fraud sufficiently under Federal Rule of Civil Procedure 9(b).  After review, the Court concludes that it lacks jurisdiction over Coffin in connection with the plaintiffs' claims for breach of contract, breach of duty, tortious interference, and violation of the Texas Deceptive Trade Practices Act, as well as for much of the plaintiffs' declaratory-judgment action.  The Court further concludes that the plaintiffs have failed to state a claim on their declaratory-judgment action to the extent that they seek a declaration that any judgment entered in this case is enforceable in Florida, and to the extent that the plaintiffs rely on the Texas Declaratory Judgment Act as a basis to recover attorneys' fees.  Finally, the Court concludes that it has jurisdiction over Coffin with regard to the plaintiffs' fraud claims.  Many of these claims, however, are not sufficiently pleaded

under Rule 9(b).  As a result, the Court will grant the motion to dismiss in part and deny it in part.


I.  Background

     Plaintiff Ponder Research Group, LLP ("Ponder Research"), is a Texas limited partnership specializing in technology consulting. Andrew Cohen and Peter Zipkin are partners in Ponder Research. (Pl.'s App. at 1.)  In November 2005, Cohen and Zipkin met with Coffin to discuss the possibility of Ponder Research's opening a marine-electronics division in Florida that would sell, install, service, and repair marine-electronics and satellite-communications equipment on ships and large yachts.  (Def.'s App. at 36-37.)  At the time, Coffin owned a 50% interest in Stateside Commercial Marine, Inc. ("SCM"), a Florida S-Corporation, which was in the marine-electronics business.  (*Id.* at 36.)  In December 2006, Coffin traveled to Texas to again meet with Cohen and Zipkin.  (Pl.'s App. at 2.)  During this meeting, the three discussed the possibility of Coffin's joining Ponder Research as a limited partner, of Coffin's becoming Ponder Research's agent in Florida, and of Coffin's operating Ponder Research's marine-electronics business in Florida.  (*Id.*) These matters were also discussed during meetings held in Florida. During the meetings, and during phone calls conducted while Coffin was in Florida, Coffin represented that he is a skilled marine-electronics technician and had operated a successful marine-elec-

tronics business--SCM.  (*Id.* at 2-3.)

The parties ultimately agreed that Coffin would become Ponder Research's agent and operate its marine division in Florida in exchange for a $100,000 annual salary and benefits.  (*Id.* at 3.) Coffin accepted the terms of this agreement while in Florida.  (*Id.*) As part of his duties as the operator of Ponder Research's marine division, Coffin was required to submit to Ponder Research reimbursement claims for expenses.  According to Ponder Research, beginning in June 2007, Coffin began submitting multiple claims for expenses, submitting inflated claims, and submitting claims without supporting receipts or with receipts that were falsified.  (*Id.* at 4.)

Ponder Research does not dispute that, during Coffin's employment with it, Coffin did not perform any work for any of its customers in Texas.  (Def.'s App. at 37.)  But Coffin did travel to Texas five time while serving as Ponder Research's agent in Florida. (Pl.'s App. at 3.)  During at least one of these trips, Coffin discussed with Cohen and Zipkin his purchasing a partnership interest in Ponder Research.  (*Id.*).  Coffin never purchased such an interest.  Coffin has produced evidence, which Ponder Research has not contradicted, that three of his five trips were primarily for personal matters.  (Def.'s App. At 37-38.)

Coffin's fifth trip to Texas, which occurred in early March 2008, did involve business with Ponder Research.  According to

Coffin, he was summoned to Texas by Ponder Research for a meeting to be held on March 4. (*Id.* at 38.) Unbeknownst to Coffin, Ponder Research had called the meeting to propose a sale of its marine-electronics division to Coffin. (*Id.* at 38.) Again, this evidence is uncontradicted by Ponder Research. While in Texas, Coffin discussed with Ponder Research his potential purchase of the marine-electronics division or its assets. (Pl.'s App. at 5.) These discussions resulted in a basic agreement that Ponder Research would form plaintiff Ponder Marine, Inc. ("Ponder Marine"), convey all of its marine-electronics division's assets to Ponder Marine, and that Coffin would purchase all of the stock in Ponder Marine. (*Id.*) These and other basic terms were memorialized in a "Confirmation of Agreement" ("the Confirmation"). (*Id.* at 6.) On March 5 the Confirmation was sent by email to Coffin, who was attempting to catch a flight back to Florida. (*Id.* at 6.) Although disputed by Coffin, according to Ponder Research, Coffin signed the Confirmation while waiting for his flight at the Dallas-Fort Worth International Airport. (*Id.*)

Pursuant to the Confirmation, Ponder Research compiled certain confidential financial documents and provided them to Coffin. (*Id.* at 7.) But Coffin refused to enter into the agreement contemplated by the Confirmation. (*Id.*) Instead, Coffin called Cohen and declared that the customers Coffin was dealing with in Florida were his. (*Id.*) Coffin retained the confidential information provided

4

to him by Ponder Research and, without authority, used remote access to Ponder Research's computers to acquire more confidential informa-tion. (*Id.*)  This information included revenue figures, profit margins, supplier lists, and customer lists. (*Id.* at 8.)  Coffin then disabled the connection between Ponder Marine's computers in Florida and Ponder Research's computers in Texas. (*Id.*)

Coffin then informed Ponder Research by phone that he was interested only in purchasing Ponder Marine's assets. (*Id.*)  Coffin threatened to open a competing marine-electronics business of his own in the event Ponder Research refused. (*Id.*)  Coffin and Ponder Research then entered into an asset-purchase agreement ("the Asset-Purchase Agreement"). (*Id.* at 9, 16-38.)  To carry out the Asset-Purchase Agreement, Coffin formed Aquatic Navigation, Inc. ("Aquatic"), a Florida corporation. (*Id.* at 9.)  The Asset-Purchase Agreement provided that Ponder Marine would acquire all of the assets of Ponder Research's marine division and resell them to Aquatic. (*Id.*)  Aquatic also assumed all of Ponder Marine's liabil-ities and agreed to indemnify and hold harmless Ponder Research for any loss resulting from any inaccuracy in any representation made by Aquatic in the Asset-Purchase Agreement, any breach of warranty by Aquatic in connection with the agreement, and any failure by Aquatic to perform under the terms and provisions of the agreement. (*Id.* at 21.)

Prior to the execution of the Asset-Purchase Agreement, Coffin

represented to Ponder Research that he had not performed any work or sold any materials that were not accurately recorded in Ponder Marine's accounting system as of May 1, 2008. (*Id.* at 10.)   The obligation to ensure that Ponder Marine's accounting records were accurate, and the representation that the records were, in fact, accurate, was also included in the Asset-Purchase Agreement. (*Id.* at 21.)

Ponder Research insists that, despite these representations, Ponder Marine's accounting records were not accurate.   Coffin allegedly failed to enter an invoice for approximately $44,000 from one of Ponder Research's suppliers, Maritime Telecommunications Network, Inc. ("MTN"), prior to the Asset-Purchase Agreement. (*Id.* at 11, 40.)   MTN had provided satellite equipment that Coffin installed on a yacht on behalf of Ponder Research. (*Id.* at 11.) MTN provided support and satellite-access services as well. (*Id.*) Because of the omission, MTN submitted the invoice to Ponder Research for payment rather than Aquatic, while Aquatic benefitted from the income generated by the support services consumed by the satellite equipment. (*Id.*)   Cohen has asked Aquatic and Coffin to pay the invoice, but they have refused. (*Id.*)

II.  Jurisdiction

"A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm

statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Mink v. AAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). Texas's long-arm statute has been interpreted to extend to the limits of due process. *Id.* Accordingly, the Court need only determine whether exercising jurisdiction over Coffin would be consistent with the Due Process Clause of the Fourteenth Amendment. *Id.* at 335-36.

The due-process analysis involves two inquiries. First, a court must determine whether the "defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state." *Id.* Second, a court must evaluate whether the exercise of jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *Id.*

A defendant's contacts with the forum may give rise to either "specific" or "general" jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994). "Specific jurisdiction exists when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action." *Mink*, 190 F.3d at 336. Contacts that are unrelated to the plaintiff's cause of action, but that are sufficiently "substantial, continuous, and systematic" may give rise to general jurisdiction. *Helicopteros Nacionales de*

7

*Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984).

The party invoking a federal court's jurisdiction bears the burden of establishing sufficient contacts by the defendant with the forum to support the court's exercise of jurisdiction. *See Bullion v. Gillespie*, 895 F.2d 213, 216-17 (5th Cir. 1990). A court may decide the jurisdictional issue based on affidavits and other evidence in the record. *See id.; see also Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, 963 F.2d 90, 95 (5th Cir. 1992). Unless a court conducts a hearing on the jurisdiction issue, the plaintiff must make only a "prima facie showing" of facts supporting the court's exercise of jurisdiction. *Freudensprung v. Offshore Tech. Servs.*, 379 F.3d 327, 342-43 (5th Cir. 2004). Proof by a preponderance of evidence is not required. *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989). "In determining whether a prima facie case exists" a court "must accept as true the plaintiff's uncontroverted allegations, and resolve in its favor all conflicts between the jurisdictional facts contained in the parties' affida-vits and other documentation." *Freudensprung*, 379 F.3d at 343 (citations and quotations omitted). The Court addresses general and specific jurisdiction below.

A.  General Jurisdiction

After summarizing the minimum-contacts analysis, Ponder Re-

8

search states that Coffin's contacts with the State of Texas are sufficient for this Court to exercise both general and specific jurisdiction over him.   But Ponder Research's analysis focuses solely on specific jurisdiction. Regardless, the contacts discussed by Ponder Research are insufficient to confer general jurisdiction.

A court may exercise general jurisdiction over a non-resident defendant when the defendant's contact's with the forum are "substantial, continuous, and systematic." *Helicopteros Nacionales De Columbia, S.A.*, 466 U.S. at 414-19.   The continuous-and-systematic-contacts test "is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Submersible Sys., Inc. v. Perforadora Cent., S.A.*, 249 F.3d 413, 419 (5th Cir. 2001). Indeed, "even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous, and systematic contacts required for a finding of general jurisdiction . . . ." *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002). And "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston v. Multidata Sys., Int'l Corp.*, 523 F.3d 602, 610 (5th Cir. 2008).

According to the evidence submitted by Coffin, which is uncontradicted by Ponder Research, Coffin's business relationship with Ponder began in November 2005, when Coffin met with Andy Cohen and Pete Zipkin, both of whom are partners in Ponder Research.   Even

though this meeting took place in Florida, Ponder Research's evi-
dence shows that Coffin traveled to Texas five times while working
for it.   Coffin's agency relationship with Ponder Research was
negotiated, in part, while Coffin was in Texas in December 2006.
Coffin acted as Ponder Research's agent in Florida for just over a
year, overseeing its marine division's operations.  Ponder Research
never discusses the extent to which Coffin's agency relationship
caused him to interact with its offices in Texas.  Coffin apparently
accessed Ponder Research's electronic financial records from Florida
in March 2008 in order to copy the records.  This was done without
Ponder Research's permission.  Coffin also submitted expense reim-
bursement requests, but Ponder Research does not discuss the nature
or frequency of these requests.   Additionally, Ponder Research
asserts that Coffin held himself out to Texas residents as its
partner and vice president.  Again, Ponder does not provide a single
specific example of this activity, or otherwise address the nature,
frequency, or duration of such acts by Coffin.

Coffin also traveled to Texas in March 2008.  During this trip,
Coffin discussed his potential purchase of Ponder Research's marine
division.  The Confirmation was drafted as a result of this meeting,
memorializing the basic agreement between Coffin and Ponder Research
and discussing the more detailed agreement that was to come.
According to the evidence submitted by Ponder Research, Coffin
signed this agreement in Texas.  Ponder Research has not addressed

10

with any specificity the purpose or length of Coffin's three other trips to Texas.

Ponder Research provided Coffin confidential information, such as customer lists and supplier lists, as part of the finalization of the agreement contemplated by the Confirmation. Coffin, however, refused to go through with the agreement. The parties then began to negotiate Coffin's purchase of Ponder Research's marine assets. These negotiations were conducted by phone while Coffin was in Florida. Coffin formed Aquatic as a Florida corporation for the purpose of purchasing the marine assets. Under the resulting Asset-Purchase Agreement, Aquatic was to acquire Ponder Marine's assets and assume its liabilities. But Coffin allegedly failed to disclose, prior to the execution of the Asset-Purchase Agreement, an invoice for satellite equipment and related services provided by MTN. As a result, Ponder Marine's liabilities were understated when assumed by Aquatic. MTN demanded payment from Ponder Research, the company who owned the marine division at the time MTN provided the equipment and services.

Finally, according to Ponder Research, Coffin purchased a company vehicle from it. As part of this transaction, Coffin executed a promissory note in favor of Ponder Research in which he agreed to make payments to Ponder Research in Texas and agreed that Texas law would govern any dispute related to the purchase.

After review, the Court concludes that these contacts are

neither substantial enough, nor continuous and systematic enough, to create personal jurisdiction over Coffin in the State of Texas for all purposes.   Ponder Research's allegations are vague and generalized, often lacking any indication as to the nature, dura- tion, or frequency of Coffin's contacts with Texas.   And to the extent that Ponder Research has identified contacts by Coffin with Texas--payments under the promissory note related to his purchase of a vehicle, phone calls to negotiate the Asset-Purchase Agreement, Coffin's remote access of Ponder's financial records, submission of reimbursement claims, and Coffin's five trips to Texas--such con- tacts are not substantial enough in nature, nor sufficiently system- atic or continuous, to confer general jurisdiction. *Johnston*, 523 F.3d at 610 (noting the ineffectiveness of vague allegations to confer general jurisdiction and comparing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952) with *Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) to demonstrate the sort of contacts necessary to support general jurisdiction).


   B.  Specific Jurisdiction

   A court may exercise specific jurisdiction over a party when the party "has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted).   "So

long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Id*. at 476 n. 17 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

The specific-jurisdiction inquiry involves a three-step analysis. *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374 (5th Cir. 2002) (citing *Burger King Corp.*, 471 U.S. at 474). First, a court must determine whether the defendant has purposefully availed himself of the privileges of conducting activities in the forum. *Id*. at 378. Coffin's contacts with Texas have been detailed in the background section, as well as the discussion of general jurisdiction, and will be recounted only as necessary for the specific-jurisdiction analysis. Next, a court must determine "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts." *Id*. Finally, a court must determine whether "the exercise of personal jurisdiction is fair and reasonable." *Id*.

"A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Sieferth v. Helicopteros Atuneros, Inc*., 472 F.3d 266, 275 (5th Cir. 2006). Accordingly, the Court addresses each of Ponder's claims and the related contacts below.

       1.   Purposeful Availment and Relation of Contacts to Causes of Action

          a.  Declaratory-Judgment and Contract Claims

13

The Texas Declaratory Judgments Act ("Texas DJA") is meant to allow courts to "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b) (Vernon 2008).[1] The act is "merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). That is, although a fully ripened independent cause of action is not required for declaratory relief to be available under the act, there must be a "justiciable controversy" as to the rights and status of the parties to the action. *See Noell v. Air Park Homeowners Assoc., Inc.*, 246 S.W.3d 827, 832 (Tex. App.--Dallas 2008, no pet.). To be justiciable, the facts must be such that the threat of litigation appears immediate and unavoidable. *Id.*

Looking to Ponder Research's allegations in support of its declaratory-judgment claim, one sees that this claim relies on

---

[1] At least one judge within this circuit has concluded, quite persuasively, that because the Texas DJA is procedural in nature, it does not govern a declaratory-judgment action in federal court. *Tex. Mut. Ins. Co. v. Wood Energy Group, Inc.*, No. A-07-CA-530 LY, 2009 U.S. Dist. LEXIS 51854, at *8-*9 n.2 (W.D. Tex. Jan. 16, 2009). Instead, under the *Erie* doctrine, federal courts apply federal procedural law, including the federal declaratory judgment act. *Id.* Neither party addressed this issue. But what is clear is that, under either state or federal law, a declaratory-judgment action is merely a procedural device to facilitate the litigation of a controversy defined by some underlying independent substantive law. *See Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F2d 167, 170, 171 (5th Cir. 1990) (describing the federal declaratory judgment act as remedial only and noting that it is the defendant's underlying cause of action against the plaintiff that is litigated in a suit under the act).

Coffin's alleged breach of the Asset-Purchase Agreement.  That is made clear by its seeking a declaration that Coffin and Aquatic were required to assume and pay Ponder Marine's liabilities existing at the time of the agreement and indemnify and defend Ponder Research regarding such liabilities.  Relatedly, Ponder Research seeks to have the Asset-Purchase Agreement reformed to reflect that Aquatic is responsible for the MTN invoice.

After review, the Court concludes that jurisdiction does not exist in Texas over Coffin in connection with these claims.  Because many of Coffin's contacts with Texas with regard to the Asset-Purchase Agreement were as Aquatic's representative, the Court must address the "fiduciary-shield" doctrine.  The fiduciary-shield doctrine creates a "general rule [that] jurisdiction over an individual cannot be based upon jurisdiction over a corporation." *Nichols v. Tseng Hsiang Lin*, 282 S.W.3d 743, 750 (Tex. App.--Dallas 2009, no pet.).  That is, contacts by an individual with the State of Texas made on behalf of a corporation are not considered when determining personal jurisdiction over the individual. *See id*.  The fiduciary-shield doctrine is not based on due process.  *See* 16 MOORE'S FEDERAL PRACTICE § 108.42[3][b][iii] & n.24.9 (2009) (discussing *Calder v. Jones*, 465 U.S. 783 (1984) and *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984)).  Rather, the availability of the doctrine is controlled by the law of the forum state.  *See id.* at § 108.42[3][b][iii] & n.24.10 (collecting cases).  Texas law recog-

15

nizes the doctrine.  *See Tseng Hsiang Lin*, 282 S.W.3d at 750; *see also Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex. App.--Houston [1st Dist.] 1998, pet. denied).

Consequently, Coffin's calls to Texas to negotiate Aquatic's purchase of Ponder Marine's assets and Aquatic's entry into the Asset-Purchase Agreement and a related promissory note cannot be considered as contacts by Coffin with Texas.  Thus, even assuming Ponder Research's claims for breach of contract and reformation arise out of these contacts by Coffin with Texas, this Court cannot exercise jurisdiction over Coffin with regard to those claims based on those contacts.

The fiduciary-shield doctrine is not absolute, however.  The doctrine does not apply to intentional torts or fraudulent acts committed by a corporate officer or agent.  *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 249 n.7 (Tex. App.--Houston [1st Dist.] 2004, pet. denied); *see also Gen. Elec. Co. v. Brown & Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 532-33 (Tex. App.--Houston [1st Dist.] 1990, writ denied).  And a corporate agent or officer may be held personally liable for fraudulent statements or knowing misrep-resentations, even when the statements or representations are made in his capacity as a corporate representative.  *Wright*, 137 S.W.3d at 250.  Ponder Research alleges that Coffin represented that he had entered all invoices submitted to the marine division into Ponder Marine's records and that such records were accurate as of May 1,

2008, fifteen days before the Asset-Purchase Agreement was executed. According to Ponder Research, Coffin had failed to enter the MTN invoice. But Ponder Research never alleges in its amended complaint or argues in its response that Coffin did so knowingly. Nor does Ponder refer to the omission of the MTN invoice in connection with its fraud cause of action. Even so, Ponder has addressed the fiduciary-shield doctrine in its briefing, and generally alleges that Coffin's conduct in connection with the Asset-Purchase Agreement was fraudulent so as to subject him to this Court's jurisdiction. Coffin's protestations that he is not a party to the agreement notwithstanding[2], these allegations are sufficient, for jurisdictional purposes, to create jurisdiction over Coffin with regard to this alleged misrepresentation. *See Guidry v. United States Tobacco Co.*, 188 F.3d 619, 628-29 (5th Cir. 1999) (concluding that tortious conduct committed outside the forum vests jurisdiction in the forum over the tortfeasor where the consequences of the conduct in the forum are seriously harmful and were intended or likely to follow from the conduct); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) ("[W]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.").

---

[2] *Wright*, 137 S.W.3d at 250 (noting a corporation's agent may be held personally liable for fraud engaged in, or misrepresentations made as, an agent); *see also Formosa Plastics Corp. United States v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 46 (Tex. 1998) ("[A] fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract.")

Ponder Research argues that the Court should completely disregard Aquatic's corporate identity and attribute all of its contacts with Texas to Coffin individually.  Ponder Research cites authority for the proposition that a corporate veil may be pierced to acquire personal jurisdiction where the corporation was merely the corporate officer's alter ego.  But, as is often the case with Ponder Research's response, in making this argument it does not discuss or refer to any specific facts that allow the Court to evaluate whether a complete disregard of Aquatic's identity would be appropriate under an alter-ego theory.  As a result, the Court will disregard Aquatic's corporate identity only to exercise jurisdiction over Coffin regarding his alleged misrepresentation of the accuracy of Ponder Marine's records.

Ponder Research's declaratory-judgment claim also refers to other vendors--TELEphony, Inc.; Jotron, USA, Inc.; and Rani Electronics--who may have submitted invoices that Coffin and Aquatic should have reported and Aquatic should have assumed.  Ponder Research does not discuss any contacts by Coffin with the State of Texas relevant to this portion of its claim.  The Court, therefore, cannot conclude that this aspect of Ponder Research's declaratory-judgment claim arises out of Coffin's contacts with Texas.

To summarize, the Court concludes that it has jurisdiction over Coffin with regard to his misrepresentation of the accuracy of Ponder Marine's records in connection with the Asset-Purchase

Agreement.  The Court does not have jurisdiction over Coffin with regard to the breach-of-contract or reformation aspects of Ponder Research's declaratory-judgment claim.  And for the same reasons discussed in connection with the declaratory-judgment claim, the Court concludes that its does not have jurisdiction over Coffin as to the breach-of-contract and reformation claims as independent causes of action.

### b.  Fraud

According to Ponder Research's allegations and evidence, Coffin used misrepresentations to induce it into the agreement by which Coffin became its agent in Florida and operated its marine division. Specifically, Coffin allegedly represented himself to be a skilled marine-electronics technician and able businessman who had success-fully operated his own marine-electronics business.  The represen-tations occurred, at least in part, during Coffin's December 2006 visit to Texas.  Ponder insists that these representations were false.

Coffin also "discussed" his potential purchase of a limited-partnership interest in Ponder Research in connection with his operation of the marine division.  This aspect of Coffin's agency relationship with Ponder Research was discussed during Coffin's initial trip to Texas, as well as during phone conversations with Cohen and Zipkin in Texas.  Coffin never purchased an interest in Ponder Research.

Additionally, it is alleged that Coffin submitted falsified or inflated claims for reimbursement to Ponder Research in Texas.  This caused Ponder Research to pay to reimburse the marine division in excess of the amount of the expenses actually incurred.

Ponder Research also alleges that when Coffin represented that he had an interest in purchasing its marine division it was only to gain access to confidential information to facilitate a takeover of the division.  Ponder Research has produced evidence that Coffin met with Cohen, Zipkin, and others connected to Ponder Research in Texas, discussed the potential purchase of the marine division in Texas, and executed the Confirmation outlining the parties' basic agreement in Texas.

Coffin argues that the Confirmation and related promissory note are irrelevant to the question of jurisdiction over him because none of the claims arise out of the agreement.  But if Coffin engaged in fraud or misrepresentation in negotiating the agreement, which Ponder Research has alleged, then the claims need not arise out of the agreement.  Instead, they arise out of his negotiation of the agreement. *See Formosa Plastics Corp. United States*, 960 S.W.2d at 46 (concluding fraud claim may be based on misrepresentation that is later subsumed into a contract).  Accordingly, the Court concludes that Ponder Research has alleged and produced prima-facie evidence of purposeful contacts by Coffin with Texas, and that the fraud claims arise out of the foregoing contacts.

c.   DTPA Violations

Ponder Research also makes claims against Coffin under the Texas Deceptive Trade Practices Act ("DTPA").   Ponder Research's allegations under the DTPA are simply too general for the Court to conclude that it has jurisdiction over Coffin in connection with these claims.   In its amended complaint, Ponder Research simply asserts that Coffin "committed one or more violations" of § 17.46 of the DTPA in providing services to Ponder Research and its custom-ers.  The complaint then recites various subsections of the § 17.46. There are, however, no factual allegations made in connection with the DTPA claims.   And Ponder Research, having been put on notice that it would have to provide the factual basis of its claims to establish jurisdiction over Coffin, does not identify in its re-sponse brief any contacts by Coffin with the State of Texas regard-ing the DTPA claims.

After an independent review of Ponder Research's pleadings and evidence, the Court notes that Ponder Research does allege that Coffin held himself out as a partner and vice president of Ponder Research to customers and the public generally.  But Ponder Research does not discuss how these alleged misrepresentations are actionable under the DTPA provisions it cites.  Regardless, Coffin's dealings with customers on Ponder Research's behalf took place in Florida. And although Ponder Research broadly alleges that Coffin also made these representations to "Texans," Ponder Research does not identify

21

a single specific instance of this.  Such a vague allegation, unaccompanied by any explanation as to how the invoked statute applies, does not satisfy Ponder Research's burden to show that jurisdiction exists over Coffin regarding the DTPA claims.

Additionally, Coffin allegedly remotely accessed Ponder Research's financial records, which are stored on its computers in Texas, and, without authority, entered, altered and, copied information.  Although Ponder Research discusses these facts in connection with its DTPA claims, it never discusses how these facts give rise to a DTPA claim.  Thus, these facts do not confer jurisdiction over Coffin for the DTPA claims either.

### d.   Tortious Interference

Similarly, the Court concludes that it is without jurisdiction over Coffin with regard to Ponder Research's tortious-interference claim.  Ponder Research makes no factual allegations in connection with this claim in its complaint and does not refer to its factual allegations in pleading the claim other than to say that "the acts and . . . misrepresentations described above" amount to tortious interference.  And again, Ponder Research has failed to respond to Coffin's motion to dismiss with any sort of clear statement of the factual basis of this claim to allow the Court to evaluate jurisdiction.  The Court is again left to review the factual allegations and evidence without guidance from the party with the burden of estab-

lishing jurisdiction.

Having done so, the Court concludes that it does not have jurisdiction over Coffin in connection with the tortious-interference claim.   Ponder Research does allege that Coffin, without authorization, obtained confidential information, including supplier lists and customer lists, with the goal of forcibly taking over the marine division or establishing a business in direct competition with the division.  But Ponder Research does not allege that Coffin actually used the information to interfere with its contracts. Instead, Coffin, as Aquatic's representative, and Ponder Research reached an agreement by which Aquatic purchased all of Ponder Marine's assets.  The only other allegation that appears relevant to this claim is Ponder Research's allegation that, contrary to its policy, Coffin gave customers his personal phone number rather than the number of Ponder Research in an effort to cause the customers to contact him directly and exclude Ponder Research from customer communications.   But Coffin dealt with customers exclusively in Florida.  And even assuming such action was tortious, the fact that a defendant's tortious conduct causes harm in the forum is not enough to confer jurisdiction over the defendant in the forum.  *See Moncrief Oil Int'l, Inc. v. Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007) (citing *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d at 870 (5th Cir. 2001).

e.   Breach of Duty

Finally, the Court addresses Ponder Research's claims for breach of duty.  Under Texas law, a fiduciary duty exists in certain limited circumstances.  *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593-94 (Tex. 1992).  Certain formal relationships, such as principal-agent, include a fiduciary duty.  *See id.; see also Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).  An agent owes its principal a duty to act solely for the principal's benefit in matters related to the agency relationship.  *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002).  Ponder Research alleges that Coffin failed to properly account for the marine division's profits, acted in his own interest and in competition with Ponder Research, and diverted business opportunities away from Ponder Research.  Ponder Research makes a host of other generalized and conclusory allegations regarding Coffin's purported breaches of duty.  Similar to its claims under the DTPA and for tortious interference, Ponder Research's complaint does not contain any factual allegations in connection with the claims for breach of duty, and the claims do not reference any of the facts alleged in other portions of the complaint.  And once again, Ponder Research has not responded to Coffin's motion to dismiss with a clear statement of the factual basis of the claims for breach of duty that would allow the Court to properly evaluate any contacts by Coffin with the State of Texas relevant to the

24

claims.

After review, the Court concludes that Ponder Research's allegations and evidence are insufficient to support jurisdiction over Coffin regarding the breach-of-duty claims.  Although not necessary for a fiduciary duty to exist, such a duty may arise from a contractual relationship.  *Morris*, 981 S.W.2d at 674 (fiduciary duty arises in certain "formal relationships"); *J. M. Radford Grocery Co. v. Estelline State Bank*, 66 S.W.2d 1110, 1111 (Tex. Civ. App.--Amarillo 1933, writ dism'd) (concluding agency relationship may be created without the exchange of consideration).  But even if the agreement by which Coffin became Ponder Research's agent bears on personal jurisdiction regarding the breach-of-duty claims, Ponder Research has not presented sufficient evidence to allow the Court to evaluate whether that agreement is such a substantial contact with Texas as to create jurisdiction over Coffin in Texas for those claims.

The only term of the agency agreement discussed by Ponder Research is Coffin's compensation--an annual salary of $100,000 plus benefits.  But the mere fact that a non-resident has contracted with a resident of the forum does not establish sufficient minimum contacts for the exercise of personal jurisdiction.  *Moncrief Oil Int'l, Inc.*, 481 F.3d at 311.  Indeed, communications directed to the forum in the course of developing and carrying out a contract are alone insufficient to support the exercise of jurisdiction.  *Id.*

25

at 312.  Rather, when a plaintiff relies upon a contractual rela-
tionship to establish specific jurisdiction over a non-resident
defendant, a court must "look to the factors of prior negotiations,
contemplated future consequences, terms of the contract, and the
parties' actual course of dealing to determine whether [the defen-
dant] purposefully established minimum contacts with the forum."
*Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985).  Ponder
Research does not address these factors.  And it does not otherwise
discuss the facts that constitute Coffin's alleged breaches of duty
or how these breaches are connected with the State of Texas.  Ponder
Research has, therefore, failed to meet its burden to establish that
jurisdiction exists over Coffin in Texas in connection with these
claims.

            2.   Fair Play and Substantial Justice

     Having concluded that Ponder Research has established suffi-
cient minimum contacts by Coffin with the State of Texas regarding
its fraud claims, the Court must now evaluate whether exercising
jurisdiction over Coffin as to these claims comports with "tradi-
tional notions of fair play and substantial justice."  *Int'l Shoe
Co. v. Washington*, 326 U.S. 310, 316 (1945).  In so doing, the Court
considers: (1) the burden upon the nonresident defendant to litigate
in that forum; (2) the forum state's interests in the matter; (3)
the plaintiff's interest in securing relief; (4) the interstate
judicial system's interest in obtaining the most efficient resolu-

tion of controversies; and (5) the several states' shared interest in furthering substantive social policies. *See Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113 (1987). Looking to these factors, the Court concludes that exercising jurisdiction over Coffin in connection with Ponder Research's fraud claims is consistent with fair play and substantial justice. Texas has a significant interest in providing a forum for its residents to litigate their claims. "If a cause of action for fraud committed against a resident of the forum is directly related to the tortious activities that give rise to personal jurisdiction, an exercise of jurisdiction likely comports with the due process clause, given the obvious interests of the plaintiff and the forum state." *Wien Air Alaska, Inc.*, 195 F.3d at 215. Coffin's travels to Texas and contacts with a Texas company show that requiring him to litigate the fraud claims in Texas would not amount to an unreasonable burden as well. Indeed, the United States Court of Appeals for the Fifth Circuit "has long held that when officers or agents direct purposeful, tortious activity towards a particular forum, they should anticipate being haled into court in that forum." *Intermed Lab. v. Perbadanan Geta Felda*, 898 F. Supp. 417, 420 (E.D. Tex. 1995) (collecting cases). Coffin has pointed to no significant countervailing consideration sufficient to prevent this Court from exercising jurisdiction over him. *Guidry*, 188 F.3d at 630 ("The defendant must present a compelling case that the presence of some other considerations

would render jurisdiction unreasonable.") (citation and quotation
omitted).  Consequently, the Court will deny Coffin's motion with
respect to the fraud claims and exercise jurisdiction over Coffin
in connection with such claims.


III.  Failure to State a Claim

Coffin's motion also seeks dismissal of Ponder Research's
declaratory-judgment claim.  As discussed above, to the extent that
this claim is predicated on Coffin's alleged breach of the Asset-
Purchase Agreement the Court has concluded that it does not have
jurisdiction over Coffin for this claim.

Ponder Research also requests a declaration that any judgment
entered in this case is enforceable in Florida under the Full Faith
and Credit Clause.  The Court may not make such an abstract pro-
nouncement.  There has been no showing that an actual controversy
exists as to whether a judgment by this Court may be enforced in
Florida.  Thus, to the extent that this portion of Ponder Research's
declaratory-judgment claim might bear on its fraud claims, regarding
which the Court has concluded it has jurisdiction over Coffin, the
Court will grant Coffin's motion to dismiss this claim under Rule
12(b)(6).

Finally, with regard to Ponder Research's declaratory-judgment
claim, Ponder Research acknowledges that "a party may not rely on
the Texas DJA to authorize attorney's fees in a diversity case."

*Utica Lloyd's v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998). Consequently, this portion of Ponder Research's declaratory-judgment claim will be dismissed as well.


IV.  Failure to Sufficiently Plead Fraud Claims

Under Rule 9(b) "a party must state with particularity the circumstances constituting fraud . . . ." FED. R. CIV. P. 9(b). "[T]he Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).  Coffin argues that Ponder Research's fraud and DTPA claims fail to meet this standard.

The Court has concluded that it does not have jurisdiction over Coffin in connection with the DTPA claims.  Hence, the Court need not address whether they have been sufficiently pleaded.  The Court has, however, concluded that it has jurisdiction over Coffin with regard to Ponder Research's fraud claims, including Coffin's alleged misrepresentation that he had entered all invoices, including the MTN invoice, into Ponder Marine's records prior to the execution of the Asset-Purchase Agreement.

Ponder Research's pleadings with regard to Coffin's entry of invoices are however, insufficient under Rule 9(b).  Ponder alleges that Coffin represented that Ponder Marine's records were accurate

as of May 1, 2008.  But Ponder does not allege when Coffin made this representation, as required by Rule 9(b).

Also insufficient are Ponder Research's pleadings with regard to Coffin's alleged submission of false claims for reimbursement and supporting receipts.  Ponder Research merely alleges that beginning in June 2007, Coffin filed claims seeking reimbursement for the same expense more than once, that Coffin filed for reimbursement for inflated amounts, and that Coffin's claims for reimbursement were either not supported by the necessary documents or were supported by falsified documents.  But Ponder Research does not identify any specific reimbursement claim that is fraudulent.  And other than stating that the false reimbursement claims began in June 2007, Ponder Research does not identify when the false claims were made. It is unclear whether Ponder Research's position is that all reimbursement claims submitted by Coffin after June 2007 were fraudulent or only some.

Additionally, Ponder Research's pleadings regarding Coffin's potential purchase of an interest in Ponder Research are insufficient under Rule 9(b).  According to Ponder Research, during the negotiation of the agreement by which Coffin became its agent in Florida, the possibility of Coffin's purchasing an interest in Ponder Research was discussed.  But to properly plead a fraud claim Ponder Research must allege that Coffin made a representation that was false, not that he merely discussed a potential future event.

However, Ponder Research's claims regarding other misrepresentations made by Coffin during the negotiation of the agency agreement are sufficiently pleaded. According to Ponder Research, during Coffin's trip to Texas in late December 2006, Coffin represented that he was a skilled marine-electronics technician who had successfully operated his own marine-electronics business. Ponder Research alleges that Coffin made these representations in order to induce it into making Coffin its agent in Florida and appointing Coffin to run its marine-electronics division. Ponder Research avers that these representations were false, in that Coffin's prior business, SCM, had been less than profitable. Based on Coffin's representations, Ponder Research entered into the agency agreement and suffered harm when Coffin operated the marine-electronics division, which became Ponder Marine, at a loss.

Ponder Research has also sufficiently pleaded a claim for fraud based on Coffin's procurement of confidential information. According to Ponder Research, Coffin expressed interest in purchasing its marine division in March 2008. As a result, the parties entered the Confirmation. Ponder Research provided Coffin with confidential business information, including vendor lists and customer lists, as part of this agreement. Coffin then backed out of the agreement. Ponder Research alleges that Coffin expressed an interest in purchasing the marine division only to obtain the confidential information to support an attempt to takeover or supplant the marine

division with his own business.

## V.  Leave to File Surreply

Ponder Research has filed a motion for leave to file a surreply (doc. #18).  Under the local rules, the movant is generally entitled to file the last pleading.  *See* N.D. TEX. LOC. CIV. R. 7.1.  Leave to file a surreply should be granted only in limited circumstances. *See Lacher v. West*, 147 F. Supp. 2d 538, 539 (N.D. Tex. 2001) (stating that surreplies are "highly disfavored" and leave to file them should be granted only in "exceptional or extraordinary circum-stances").  Ponder Research argues that a surreply is necessary "to address several misstatements of law and fact" and that it will "assist the Court."  But Ponder Research does not identify any specific misstatement of law or fact and has not otherwise estab-lished why a surreply is necessary in this case.  Accordingly, the Court DENIES the motion for leave to file surreply.

## VI.  Conclusion

Accordingly, the Court GRANTS IN PART Coffin's motion to dismiss for lack of jurisdiction, dismissing Ponder Research's claims for tortious interference, breach of duty, breach of con-tract, and violation of the DTPA.  The Court also dismisses for lack of jurisdiction Ponder Research's claim under the Texas DJA, to the extent such claim is based on its claims for breach of contract and

reformation.   The Court also GRANTS IN PART Coffin's motion to dismiss for failure to state a claim, dismissing Ponder Research's claim for a declaration as to the enforceability of a judgment in this case in Florida and for attorneys' fees under the Texas DJA. Finally, the Court GRANTS IN PART Coffin's motion to dismiss for failure to plead fraud sufficiently under Rule 9(b), dismissing Ponder Research's fraud claims based on Coffin's alleged misrepresentation regarding the MTN invoice, submission of false claims for reimbursement, and potential purchase of a partnership interest in Ponder Research.   All other requests in Coffin's motion are DENIED.

SIGNED: September 4, 2009.

_Terry R. Means_

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE